Opinion issued February 10, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00510-CV

———————————

David B.T. Myrick, Jr., Appellant

V.

Moody
National Bank, Trustee, Appellee



 



 

On Appeal from the 10th District Court

Galveston County, Texas



Trial Court Case No. 07CV0323

 



 

O P I N I O N

Appellant
David B.T. Myrick, Jr. appeals from a declaratory judgment granted in favor of
appellee Moody National Bank.  The bank
is the trustee and Myrick is a beneficiary of a trust created in 1934.  Myrick sued the trustee, seeking a
declaratory judgment that it did not have the authority to enter into a lease
with terms extending beyond the termination date of the trust.  The trustee countersued, seeking, among other
things, a declaration of its right to enter into the proposed lease and its
authority to borrow against the trust estate. 
Both parties moved for summary judgment, and the trial court granted
partial summary judgment in favor of the trustee, declaring that it had
authority to enter into a lease extending 180 days beyond the expiration
of the trust and to borrow funds and encumber the trust property.  The remaining issues were tried before the court,
and the summary-judgment rulings merged into the final judgment.

On appeal Myrick argues that the
trustee did not establish its authority to enter into the proposed lease and
the trial court lacked jurisdiction to declare the trustee’s authority to
borrow because the controversy was not ripe. 
In the event we grant relief to Myrick on either issue, both parties
request a remand on the subject of attorney’s fees.  Finding no error, we affirm.

Background

          During
the 1930s, William L. Moody, III (Moody III) and his family owned and lived on
the Rio Bonito Ranch, which consists of approximately 15,000 acres near
Junction, Texas.  Moody III encountered
financial difficulties in 1934, and a creditor foreclosed on the property.  Through an agent, W.L. Moody, Jr.
(Moody Jr.), the father of Moody III, purchased the ranch at the
foreclosure sale and conveyed it to Rio Bonito Ranch, Inc., a corporation
created and owned by Moody Jr.

The trust
agreement.  On December 31, 1934, Moody Jr.
executed a trust agreement creating an irrevocable trust.  Pursuant to the agreement, he conveyed all
capital stock of Rio Bonito Ranch, Inc. in trust to City National Bank of
Galveston, Texas.  City National Bank of
Galveston is the former corporate name of the current trustee, Moody National
Bank of Galveston.  The trust agreement
gives the trustee the power to “possess, hold and vote” the Rio Bonito Ranch
stock and to “receive, collect and recover all dividends, income and profits
therefrom, as if [it] were the absolute owner.” 
The trustee is expressly prohibited from selling “said stock or any part thereof, except as
hereinafter provided for” in the trust agreement.  The agreement also provides that
the trustee may “liquidate said corporation and accept the corporate assets in
lieu of the stock, in which latter event such assets shall be possessed, held
and managed in lieu of the stock for the accomplishment of the uses and
purposes herein set forth and subject to the terms, conditions and powers
herein specified.”

The settlor specified that the
beneficial interest was to be vested in his offspring, including his son, Moody
III; his grandchildren, Edna Haden Moody, Virginia Moody, and William Lewis
Moody, IV (Moody IV); and his great-grandchildren.  The trust agreement requires the trustee to
pay the taxes, expenses, and fees chargeable to the estate out of the income of
the trust, and then to pay the net income from the trust estate to Moody III
on a semi-annual basis until his death.  After Moody III’s death, payments are to
be made in equal shares to his children, or if his children are deceased or die
before the termination of the trust, to their descendants per stirpes.  The agreement specifies several events that
would cause the trust to terminate, but the likely terminating event, and the
only one that is relevant for purposes of this appeal, is the death of
Moody IV, the last survivor of Moody III’s children who were living
at the time the trust was created.  Upon
termination, the trustee must distribute the trust estate in equal shares per
stirpes to the then-living grandchildren of Moody III and the surviving
descendants of his deceased grandchildren.

          The
trust gives the trustee broad authority and discretion to make decisions concerning
the construction and administration of the trust.  Paragraph IX provides:

If any question should arise concerning the construction and
administration of this Trust, the Trustee, acting either on its own judgment or
under direction or advice, upon such evidence as it shall think fit, may
determine such question, and such determination or determinations shall be
final and binding on all persons.  It is
agreed that the Trustee shall have power to determine all matters as to which
any doubt, difficulty or question may arise under or in relation to the
execution of the Trust.

 

Following the execution of the
trust agreement, Moody III lived on the ranch for a number of years.  He died in 1992, survived by all three of his
children.  His two daughters are now
deceased.  Moody IV, who was 84
years old at the time of trial, is the last surviving child of
Moody III.  Unless some other
terminating event occurs, the trust will terminate upon his death, and the
trustee will then be required to distribute the trust estate in accordance with
the terms of the trust agreement.

Administration
of the trust.  Although
Moody III lived on the ranch for many years, it was leased in 1966 to a third
party.  In 1977, in accordance with the
terms of the trust instrument, the trustee dissolved the corporation.  Since then, the trustee has held title to the
ranch in trust for the beneficiaries. 
The Rio Bonito Ranch is the sole income producing asset in the
trust.  The ranch was leased again in
1982 to Rieck Ranch Corporation.  As a
part of its operations on the ranch, Rieck allowed hunters to pay to hunt wild
game on the property.  The Rieck lease
expired in 1997.  At that time, the
trustee requested and received bids from prospective lessees.  

The trustee entered into a new lease
with the highest bidder, ABG, Inc.  ABG
operates a recreational and hunting enterprise, which utilizes the acreage,
ranch house, and other buildings on the ranch. 
Under the terms of that lease, ABG is responsible for ranch operation
costs and some maintenance costs, including road and fence repairs.  As a part of its operations, ABG imported
non-native game animals onto the ranch and constructed two high-fenced
enclosures, which it uses to acclimate the imported animals.  ABG enters into agreements with hunters, who
pay up to several thousand dollars to hunt on the premises.  These hunts are booked weeks or months in
advance.  The ABG lease and lease
extensions terminated in May 2005, but with consent of the trustee, ABG has
remained on the ranch as a holdover tenant and has continued to conduct its
operations.

The terms of the ABG lease provide
that upon termination of the trust, ABG has 30 days to cease operations and
remove its personal property from the ranch. 
As a holdover tenant, ABG continues to be responsible for operations
costs, and it is bound to cease operations on the ranch within the same 30-day
window.

          In
2005 and 2007, the trustee secured appraisals of the fair market value of the
ranch.  Based on the appraiser’s
assessments, the trustee determined that the best use of the property and best
source of income was to continue leasing the property to ABG.  The trustee desired to ensure that the trust would
continue to have a source of income by leasing to ABG, and it wished to modify
the lease terms to charge an adjustable rental rate to reflect increasing land
values.  During negotiations over a new
lease, ABG expressed concerns regarding its potential economic losses and
liability upon termination of the trust. 
In particular, ABG was concerned about minimizing its personal property
losses and avoiding potential liability for canceling hunts after the trust
terminates.

To address ABG’s concerns related
to the unpredictable timing of the termination of the trust, the trustee
proposed to allow ABG to remain on the property for 90 days in order to
conclude its operations and up to an additional 90 days to remove its
personal property, specifically the non-native game animals.  Based on its need to secure an income for the
trust and the nature of ABG’s business, the trustee concluded the proposed
terms are reasonable.  The trustee also concluded
that it had authority pursuant to the terms of the trust and the Texas Trust
Code to execute a lease including terms that would extend beyond the duration
of the trust.  See Tex. Prop. Code Ann § 113.011(b) (West 2007) (“A trustee may execute a lease
containing terms or options that extend beyond the duration of the trust.”).

          The controversy and procedural background.  After negotiating the terms of the new lease,
the trustee informed the trust beneficiaries of its intention to enter into a
second lease with ABG.  Myrick, a
grandson of Moody III and trust beneficiary, objected to the proposed lease
terms and challenged the trustee’s authority to enter into a lease extending beyond
the termination of the trust.  He
threatened to take legal action against any buyer, lender, or potential tenant
involved in a transaction to encumber any part of the ranch property.  Myrick also filed a petition seeking
declaratory judgment that the trustee lacked authority to enter into the
proposed lease.  In addition to
declaratory relief, he requested that the trial court direct the trustee to
distribute the assets of the trust upon the death of Moody IV and to
prohibit the trustee from entering into any lease or agreement with a third
party that gives the lessee rights in the trust property beyond the date of
termination.

          The
trustee countersued for a declaratory judgment confirming its right to enter
into the lease.  Specifically, the
trustee asked that the trial court to declare that it had authority to lease
the trust estate for up to 180 days beyond the duration of the trust and that
upon termination of the trust the beneficiaries would take their interest
subject to the existing lease.  The
trustee sought additional relief, including declarations (1) that it may
borrow funds and encumber the trust estate to cover operating costs and
expenses in the event that the property is no longer occupied by a tenant or
the tenant income is inadequate to pay the trust’s expenses, and (2) that
it has the authority to sell all or part of the trust estate and divide the
proceeds among the beneficiaries without causing the trust to terminate.  The trustee also sought judicial modification
of the trust and attorney’s fees.

          In
support of its counterclaim for declaratory relief, the trustee submitted the
affidavit of its chief trust officer, who averred that a declaration of the
trustee’s ability to mortgage the trust estate was essential to achieve
“prudent and efficient administration of [the] Trust.”  He explained: “Without a tenant in place, the
Trust does not have income adequate to pay the taxes and insurance on an
on-going basis. . . .  [T]he Trust will
need to be able to borrow against the Ranch and pledge it as collateral to
repay any expenses in excess of disposable income.”  Although the current tenant income is
sufficient to sustain the trust, the officer averred that the beneficiaries had
not received a distribution in several years and that “even with the execution
of a new lease, there will be little or no residual funds for distribution in
the near future.”

          The parties
filed cross-motions for partial summary judgment.  The trial court denied Myrick’s motion and
partially granted the trustee’s requests for declaratory relief, concluding as
follows:

The Trustee has the
authority to enter into a lease regarding the Rio Bonito Ranch . . . that will
permit a lessee to pay stated rentals, remain on and use the property for its
business purposes without over harvesting of native species . . . for 90 days
after termination of the Trust . . . .

 

The trustee has the
authority to enter into a lease regarding the Ranch that will permit a lessee
to feed, secure and remove specified non native game animals from the Ranch for
180 days after termination of the Trust.

 

The beneficiaries who are
entitled to an interest in the Trust Property on termination of the Trust will
take their interest subject to the Lease made the subject of this proceeding
and entered into by the Trustee.

 

The Trustee has the authority
to borrow funds and encumber the Ranch to cover operating or expense items on
the Ranch in the event the Trust loses its tenant or the tenant income is
inadequate to pay expense and fund reserves.

 

The trial court denied the trustee’s request for a
declaration that it had the authority to sell the ranch without terminating the
trust.

          The
remaining issues—the trustee’s
request for judicial modification of the trust and the parties’ requests for
attorney’s fees—were
considered by the court in a bench trial. 
The trial court determined that the trustee was not entitled to a
judicial modification and ordered the parties to bear their own attorney’s fees
and costs.  The trial court entered a
final judgment, which incorporated the court’s summary-judgment rulings, and
Myrick appealed.

          On
appeal, Myrick raises three issues.  He
argues (1) that the trial court erred in granting declaratory judgment in
favor of the trustee on the issue of its authority to enter into a lease that
includes terms extending beyond the termination of the trust, and (2) that
the trial court did not have jurisdiction to enter a declaratory judgment on
the issue of the trustee’s authority to borrow funds because of a purported
lack of a ripe controversy.  With respect
to both issues, Myrick asks that we reverse and render judgment in his
favor.  In his third issue, he contends that
if this court reverses any aspect of the trial court’s judgment, we should
remand for a new determination of attorney’s fees.  The trustee argues that this court should
affirm the judgment of the trial court, but if this court reverses any part of
the judgment, it agrees that we should remand on the issue of attorney’s fees.

Analysis

We review a trial court’s
summary-judgment decision de novo.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005).  To prevail
on summary judgment, the movant has the burden of proving that there is no
genuine issue of material fact and that it is entitled to judgment as a matter
of law.  Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548–49 (Tex. 1985); see Tex.
R. Civ. P. 166a(c).  In
deciding whether there is a disputed issue of material fact precluding summary
judgment, we take as true evidence favorable to the non-movant, indulging every
reasonable inference and resolving any doubts in its favor.  Provident
Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex.
2003).  A matter is conclusively
established if reasonable people could not differ as to the conclusion to be
drawn from the evidence.  City of Keller v. Wilson, 168 S.W.3d
802, 816 (Tex. 2005).  When, as here,
both sides move for summary judgment and the trial court grants one motion and
denies the other, we review the summary-judgment proof presented by both sides,
determine all questions presented, and render the judgment the trial court
should have rendered.  Valence, 164 S.W.3d at 661; CenterPoint Energy Houston Elec., L.L.P. v.
Old TJC Co., 177 S.W.3d 425, 430 (Tex. App.—Houston [1st Dist.] 2005, pet.
denied).

I.                 
Trustee’s authority to lease

Myrick argues that the trial court
erred in granting declaratory relief to the trustee because the trust agreement
does not give the trustee the power to enter into a lease extending 180 days
beyond the termination date of the trust. 
He further contends that section 113.011 of the Trust Code—which authorizes a trustee to enter into a
lease containing terms that extend beyond the duration of the trust—is inapplicable because it conflicts with the
language of the trust agreement.  The
trustee contends that it may enter into the lease because the four corners of
the trust permit it and because there is no conflict between the language of
the trust agreement and the Trust Code. 
Accordingly, to resolve this dispute and determine whether the trustee
may enter into the negotiated lease, we must determine whether there is a
conflict between the trust agreement and the Code.

The Trust Code applies to all
trusts created on or after January 1, 1984 and to all transactions related to trusts
created before or after that date.  See Tex.
Prop. Code Ann. § 111.006 (West
2007).  A trustee may exercise any power
necessary to carry out the purpose of the trust, except to the extent that the
terms of the trust conflict with a provision of the Code or expressly limit the
trustee’s power.  Id. §§ 113.001–.002 (West
2007).

Under the Trust Code, the trustee is given broad powers to manage real
property.  See id. §§ 113.009–.012 (West 2007).  In particular, “[a] trustee may grant or take
a lease of real or personal property for any term,” and that “[a] trustee may
execute a lease containing terms or options that extend beyond the duration of
the trust.”  See id. § 113.011.  If
the Trust Code applies in this case, then the trustee generally has the power
to enter into a lease extending beyond the duration of the trust, and more
specifically, the trustee has the authority to enter into the proposed lease
with ABG.

However, “[a] power given to a trustee by [the Trust Code] does not apply
to a trust to the extent that the instrument creating the trust, a subsequent
court order, or another provision of [the Code] conflicts with or limits the
power.”  Id. § 113.001. 
Accordingly, if the trust instrument expressly limits the powers of the
trustee or if it provides that the trustee has greater powers than those
conferred by the Trust Code, then the language of the trust instrument will
control.  But if the terms of the trust
instrument do not limit or conflict with a power given to trustee, the default
rules supplied by the Trust Code apply.  See id.; Dierschke v. Cent. Nat’l Branch of First Nat’l Bank at Lubbock, 876
S.W.2d 377, 380 (Tex. App.—Austin 1994, no writ).

Because powers granted under the
Trust Code are inapplicable to the extent they conflict with the instrument
creating the trust, we must examine the trust created by Moody Jr. to determine
whether it precludes the trustee from entering into a lease of the trust
property beyond the expiration of the trust. 
The trust agreement provides that the trustee has authority to possess,
hold, and manage the trust assets.  It
states:

The
trustee shall possess, hold and vote said shares of stock; receive, collect and
recover all dividends, income and profits therefrom, as if the Trustee were the
absolute owner; provided, however, that said Trustee shall not have the power
to sell [the] stock . . . .

 

It also permits the trustee to liquidate the assets
of the corporation, “in which . . . event such assets shall be
possessed, held and managed in lieu of the stock for the accomplishment of the
uses and purposes herein set forth and subject to the terms, conditions and
powers herein specified.”

The trust agreement describes to
whom and how frequently distributions should be made to the beneficiaries, and
it describes the trustee’s duties upon the termination of the trust:

After
the payment of the Trustee’s fees, taxes and expenses properly chargeable to
the Trust Estate . . . the Trustee shall pay over the net income
from the Trust Estate semi-annually . . . in equal shares to [the
beneficiaries].

 

.
. . .

 

[The]
Trust shall terminate when the last survivor of William Lewis Moody, III’s
children . . . shall have died . . . . 
Unless the Trust Estate has been disposed of as herein provided before
the death of the last survivor of William Lewis Moody, III’s children, then the
Trustee shall, upon the termination of the Trust, distribute the Trust Estate
in equal shares per stirpes to the then living grandchildren of William Lewis
Moody, III, and the surviving issue of his deceased grandchildren.

 

The trust agreement does not place any other express
limitations on the trustee’s power to manage the assets and administer the
trust, though Myrick contends that the trustee’s power is also limited to “the
accomplishment of the uses and purposes” of the trust and by “the terms,
conditions and powers . . . specified” by the trust instrument.  We also note in this regard that the trust
agreement provides that the trustee, as manager of the trust, has the
discretion “to determine all matters as to which any doubt, difficulty or
question may arise under or in relation to the execution of the trust,” and to
resolve concerns regarding the administration of the trust “on its own
judgment” and “upon such evidence as it shall think fit.”

To prevail, Myrick must demonstrate that the terms of the trust agreement
conflict with the Trust Code. 
Significantly, neither party contests the trustee’s general authority to
lease the ranch, and the terms of the trust agreement do not expressly limit
the trustee’s authority to enter into or to negotiate the terms of a
lease.  Myrick argues, however, that the
provision in the trust agreement requiring the trustee to distribute the trust
estate “upon the termination of the trust” conflicts with section 113.011’s
authorization of lease terms extending beyond termination of the trust.

We interpret trust instruments the
same way as wills, contracts, and other legal documents.  Lesikar
v. Moon, 237 S.W.3d 361, 366 (Tex. App.—Houston [1st Dist.] 2007, pet.
denied).  In interpreting a trust
instrument to determine the powers of the trustee, we look to the four corners
of the trust instrument to ascertain the settlor’s intent.  Hurley
v. Moody Nat’l Bank of Galveston, 98 S.W.3d 307, 310–11 (Tex. App.—Houston
[1st Dist.] 2003, no pet.).  If possible,
the court should construe the instrument to give effect to all its provisions
so that no provision is rendered meaningless. 
Coker v. Coker, 650 S.W.2d
391, 393 (Tex. 1983).  To the extent the
trust instrument is silent, the provisions of the Trust Code govern.  See
Tex. Prop. Code Ann. § 113.001; Conte v. Conte, 56 S.W.3d 830,
832 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

While this trust is still in existence, the trustee has the authority to
“possess, hold, and manage” the trust assets. 
The trustee must manage the property “as a prudent investor would, by
considering the purposes, terms, distribution requirements, and other
circumstances of the trust,” and must “exercise reasonable care, skill, and
caution” in doing so.  Tex. Prop. Code Ann. § 117.004
(West 2007).  The trust instrument
provides that the trustee, acting on its own judgment, may determine questions
related to the construction and administration of the trust and that such
determinations are final and binding upon all persons.  When the trust terminates, the trustee must,
within a reasonable time and in accordance with the trust instrument,
distribute the estate “in equal shares per stirpes to the living grandchildren
of [Moody III] and the surviving issue of his deceased grandchildren.”  See id. § 112.052 (discussing termination
of trusts).

Myrick contends that the trust instrument unambiguously requires the
trustee to distribute the trust estate immediately upon the termination of the
trust.  He argues that the terms of the
trust require the trustee to distribute the ranch to the beneficiaries and that
the beneficiaries must receive a possessory interest in the land.  He contends that section 113.011 contradicts
the terms of the trust instrument because if the trustee is allowed to enter
into a lease with terms that extend beyond the termination of the trust, it
will not be able to fulfill its mandatory duty to distribute the trust estate
and the beneficiaries will be deprived of the use and enjoyment of the ranch.  

While the trustee is obligated to distribute the estate when the trust
terminates, it does not follow that the beneficiaries must be able to
immediately occupy the land to the exclusion of any leaseholder.  Nothing in the trust agreement expressly
states that the trustee cannot enter into a lease containing terms that extend
beyond the termination of the trust, nor does it require the trustee to
distribute the trust assets free of encumbrances.  Moreover, nothing in the trust agreement
indicates that the settlor intended the beneficiaries to receive an immediate
possessory interest in the ranch property. 
Indeed, had the trustee elected to continue to hold the assets in stock,
as the trust agreement expressly contemplates, the beneficiaries would have
received shares of stock in Rio Bonito Ranch, Inc. (instead of an undivided direct
interest in land) and the right to receive a proportionate share of rentals
paid by ABG during the 180 days it is permitted to remain on the Ranch property
after the trust terminates.  Had the
corporation not been dissolved, the beneficiaries would have received the right
to vote on how to operate the corporation, but they would not have been
entitled to an immediate possessory interest in the Rio Bonito Ranch.  Now, assuming the trustee enters into the
proposed lease with ABG, the beneficiaries will simply take their interest
subject to the tenant’s right to remain on the property for up to 180
days.  The trustee will not be thereby prevented
from exercising his duty to distribute the trust property in accordance with
the terms of the trust instrument.  See Tex.
Prop. Code Ann. § 112.052; Sorrel
v. Sorrel, 1 S.W.3d 867, 870–71 (Tex. App.—Corpus Christi 1999, no pet.).

Because we conclude that the trust provision requiring distribution of
the trust estate upon the termination of the trust is not in conflict with
section 113.011 of the Trust Code, we hold that the trustee has the power to
enter into a lease with ABG containing commercially reasonable terms that
extend the lease beyond the termination of the trust, and we overrule Myrick’s
first issue.

II.              
Trustee’s authority to borrow

In his second issue, Myrick argues
that the trial court erred in granting the trustee’s request for declaratory
relief concerning its authority to borrow funds and encumber the trust estate
because the issue was not ripe for adjudication.

The purpose of the Declaratory
Judgments Act is “to settle and to afford relief from uncertainty and
insecurity with respect to rights, status, and other legal relations . . . .”  Tex.
Civ. Prac. & Rem. Code Ann § 37.002 (West 2008);
Bonham State Bank v. Beadle, 907
S.W.2d 465, 467 (Tex. 1995).  “Whether a
court has subject-matter jurisdiction to consider an action for declaratory
judgment depends upon whether the underlying controversy falls within the
constitutional and statutory jurisdiction of the court.”  Fort
Bend Cnty. v. Martin-Simon, 177 S.W.3d 479, 483 (Tex. App.—Houston [1st
Dist.] 2005, no pet.).  Section 37.005 of
the Civil Practice and Remedies Code and section 115.001 of the Trust Code
further provide that district courts have jurisdiction in all proceedings
concerning trusts, including proceedings brought by a trustee to determine its
powers, responsibilities, and duties under the trust.  Tex.
Civ. Prac. & Rem. Code Ann. § 37.004 (West 2008); Tex.
Prop. Code Ann. § 115.001
(West 2007).  There is a justiciable
controversy between parties if there is a real and substantial controversy
involving a genuine conflict of tangible interests and not merely a theoretical
dispute.  Bonham State Bank, 907 S.W.2d 465, 467 (Tex. 1995); Di Portanova v. Monroe, 229 S.W.3d 324,
329 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

Here, the trustee sought, and the
trial court granted, a declaration that “[t]he Trustee has the authority to
borrow funds and encumber the Ranch to cover operating or expense items on the
Ranch in the event the Trust loses its tenant or the tenant income is
inadequate to pay expense and fund reserves.” 
Because of the precarious financial situation of the trust estate, the
trustee believed it likely that the trust would need to borrow funds or
encumber the trust estate in order to pay trust expenses.  In a sworn affidavit, the chief trust officer
explained that “[w]ithout a tenant in place, the [t]rust does not have income
adequate to pay the taxes and insurance on an on-going basis . . . .  In the event the lease income ceases, the
Trust will need to be able to borrow against the Ranch and pledge it as
collateral to repay any expenses in excess of disposable income.”  The officer’s affidavit states that Myrick
informed the trustee that he opposed its authority to encumber or pledge any
party of the ranch as collateral and threatened legal action against any lender
involved in such a transaction.  The
officer further explained that the marketability of the property has been
adversely impacted by the threat of litigation because it is obligated to
convey Myrick’s threats to prospective tenants, lenders, and purchasers.

          Myrick
argues for the first time on appeal that this issue is not ripe and that the
trial court’s declaration regarding the trustee’s power to borrow funds is an
impermissible advisory opinion on a hypothetical situation.  However, a threat of litigation in the
immediate future can provide the basis for a ripe controversy.  See,
e.g., Harris Cnty. Mun. Utility Dist.
No. 156 v. United Somerset Corp., 274 S.W.3d 133, 140 (Tex. App.—Houston
[1st Dist.] 2008, no pet.).  Although
there is currently a tenant leasing the trust estate, its status is that of a
month-to-month holdover tenant.  The trustee
alleged that the trust estate is not well funded, and there is no dispute that despite
receiving annual lease revenues of approximately $145,000, the trustee has not
made a distribution to the beneficiaries in several years.  Even if the proposed lease with the current
tenant is executed, the trustee does not anticipate that that there will be a
distribution for several more years. 
Myrick has indicated that he would oppose the trustee and take action
against any party involved if the trustee seeks to borrow money against the
trust estate.  The trustee’s ability to
make prudent management decisions is and has been affected by its inability to
provide reasonable assurances to prospective tenants and lenders regarding the
liability they may face upon entering into an agreement with the trust.  And, given Myrick’s history of initiating
litigation with respect to this and other related trusts, as well as the
disagreement among the beneficiaries, litigation seems unavoidable.  Accordingly, we hold that a ripe controversy
exists and the trial court had jurisdiction to grant the trustee’s request for
declaratory relief.  We overrule Myrick’s
second issue.

III.          
Attorney’s fees 

In his final issue, Myrick asks
this court to remand on the issue of attorney’s fees if we reverse any part of
the trial court’s judgment.  Because we
hold that the trial court did not err in its judgment declaring the trustee’s
right to enter into a lease with terms that extend 180 days beyond the
termination date of the trust, and because the trial court had jurisdiction to
enter judgment on the issue of the trustee’s right to borrow against the trust
estate, we do not reach this issue.

Conclusion

          We affirm the judgment of
the trial court.

 

                                                                   Michael
Massengale

                                                                   Justice

 

Panel
consists of Justices Keyes, Sharp, and Massengale.